UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FTEX FOOD & LIQUOR, INC., an Illinois Corporation, and IMAD GHIZAWI, an Individual, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 21 C 1325 |
| v. | ) ) | Judge Durkin |
| UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) | |

**UNITED STATES' MEMORANDUM IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

**Table of Contents**

Table of Authorities ..................................................................................................iii

Introduction ........................................................................................................... 1

Background ............................................................................................................ 1

     A.    Statutory and Regulatory Scheme................................................. 1

     B.    Investigation of Ftex........................................................................ 3

     C.    Ftex's Permanent Disqualification from SNAP ...................... 6

Legal Standard .................................................................................................... 12

Argument ............................................................................................................. 14

     A.    FNS's Trafficking Determination Is Fully Supported by the Administrative Record ................................................................ 14

     B.    The Sanction Imposed Was Supported by the Law and Facts ............ 20

Conclusion ........................................................................................................... 22

**Table of Authorities**

Page(s)

Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................... 15, 16

*ANS Food Mkt. v. United States*, No. JKB-14-2071, 2015 WL 1880155 (D. Md. Apr. 22, 2015)  5

*Bailor v. Salvation Army,* 51 F.3d 678 (7th Cir. 1995) ................................................................. 15

*Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309 (7th Cir. 2003) ...... 15

*Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176 (7th Cir. 1993) ................................ 15

*Bronx Deli Grocery Corp. v. United States*, No. 11 Civ. 1527, (S.D.N.Y. June 18, 2012) .......... 23

*Brooks v. United States*, 64 F.3d 251 (7th Cir. 1995) ................................................................. 23

*Bros. Food & Liquor, Inc. v. United States*, 626 F. Supp. 2d 875 (N.D. Ill. 2009) ..................... 16

*Estremera v. United States*, 442 F.3d 580 (7th Cir. 2006) .......................................................... 23

*Fells v. United States*, 627 F.3d 1250 (7th Cir. 2010) ..................................................... 4, 5, 6, 16

*First on First Deli v. United States*, 2022 WL 522427 (S.D.N.Y. Feb. 2, 2022) ........................ 18

*Ibrahim v. United States,* 834 F.2d 52 (2d Cir. 1987) ................................................................. 16

*Idias v. United States*, 359 F.3d 695 (4th Cir. 2004) ................................................................... 24

*J. Mart, Inc. v. United States*, C.A. No. 13-424 S, 2013 WL 5755186 (D.R.I. Oct. 23, 2013) .... 17

*Kahin v. United States*, 101 F. Supp. 2d 1299 (S.D. Cal. 2000) ............................................. 17, 21

*Loma Deli Grocery Corp. v. United States*, 20 Civ. 7236, (S.D.N.Y. Sept. 10, 2021) ............... 18

*McClain's Mkt. v. United States*, 411 F. Supp. 2d 772 (N.D. Ohio 2005) ................................... 21

*McGlory v. United States*, 763 F.2d 309 (7th Cir. 1985) ............................................................. 16

*Merrick Deli Corp. v. United States* No. 11-CV-977 (SLT)(RER), 2014 WL 6891944 ........ 24, 25

*Negash v. United States*, No. 17-1954, 2018 WL 722481 (D. Md. Feb. 5, 2018) ................. 19, 23

*Onukwugha v. United States*, No. 11-CV-907, 2013 WL 1620247 (E.D. Wis. Apr. 12, 2013) ... 16

*Petra Mini Mart, Inc. v. United States*, No. 16-CV-4573, (N.D. Ill. June 6, 2017) ..................... 16

*Rockland Convenience Store v. United States*, No. 10-cv-260-LM, (D. N.H. Oct. 27, 2011) ..... 19

*Saudabad Convenience, Inc. v. USDA*, 2014 WL 611194 (D.R.I. Feb. 18, 2014) ........................ 5

*Saunders v. United States*, 507 F.2d 33 (6th Cir. 1974) ................................................................ 16

*Shanaa v. United States*, No. 15-CV-42, 2017 WL 2838150 (E.D. Wis. June 30, 2017) ........... 18

*Springer v. Durflinger,* 518 F.3d 479 (7th Cir. 2008)................................................................... 15

*Timsina v. United States*, 2019 WL 3254689 (D. Vt. July 19, 2019) .......................................... 18

*Tony's Pantry Mart Inc. v. United States*, No. 15 C 2967, (N.D. Ill. Feb. 8, 2017).............. passim

*Yafaie v. United States*, No. 94 Civ. 7825(KMW), 1995 WL 422169 (S.D.N.Y. July 18, 1995) 24

*Young Choi Inc. v. United States*, 639 F. Supp. 2d 1169 (D. Haw. 2009)................................... 18

*Young Jin Choi v. United States*, 944 F. Supp. 323 (S.D.N.Y. 1996) ......................................... 24

## Statutes

7 U.S.C. § 2012(k) ............................................................................................................................. 5

7 U.S.C. § 2013(a) ............................................................................................................................. 5

7 U.S.C. § 2021(a)(2)..................................................................................................................... 6, 18

7 U.S.C. § 2021(b)(3)(B) .............................................................................................................. 5, 24

7 U.S.C. § 2023................................................................................................................................. 16

7 U.S.C. § 2023(a)(15)...................................................................................................................... 16

7 U.S.C. §§ 2011 ................................................................................................................................ 4

U.S.C. §§ 2011, 2013(a) .................................................................................................................... 4

## Rules

Fed. R. Civ. P. 56(a) ........................................................................................................................ 15

## Regulations

7 C.F.R. § 271.2 ................................................................................................................................. 5

7 C.F.R. § 271.3(a) ........................................................................................................... 4

7 C.F.R. § 278.6(a) .................................................................................................... 6, 18

7 C.F.R. § 278.6(e)(1)(i) .................................................................................................. 24

7 C.F.R. § 278.6(i) ................................................................................................ 9, 24, 25

**Introduction**

Plaintiffs Ftex Food & Liquor, Inc. ("Ftex"), and Imad Ghizawi challenge the Food and Nutrition Service's ("FNS") Final Agency Decision permanently disqualifying their firm from participation in the Supplemental Nutrition Assistance Program ("SNAP"). FNS determined that Ftex illegally trafficked program benefits following an analysis of the store's sales data, two store inspections, and a review of customers' transaction data for nearby stores. The documents and testimony provided by Ftex and Ghizawi fall far short of creating a genuine issue of material fact as to the validity of the agency's decision to permanently disqualify their firm. Accordingly, the United States is entitled to summary judgment as a matter of law.

**Background**

**A.      Statutory and Regulatory Scheme**

Congress established the Food Stamp Program in 1964 to alleviate hunger and malnutrition among low-income households by augmenting their ability to purchase food. *Fells v. United States*, 627 F.3d 1250, 1252 (7th Cir. 2010); 7 U.S.C. §§ 2011, 2013(a). In 1996, Congress set a deadline for states to replace the original paper coupons "with electronic benefit transfer ('EBT') systems[.]" *Fells*, 627 F.3d at 1252 (citing 7 U.S.C. § 2016(h)). Upon completion of this transition in 2008, Congress renamed the program the Supplemental Nutrition Assistance Program ("SNAP"). *Id.* FNS, an agency of the United States Department of Agriculture, administers SNAP. 7 C.F.R. § 271.3(a).

Under SNAP, as authorized by the Food and Nutrition Act of 2008 ("FNA"), 7 U.S.C. §§ 2011-2036d, eligible households receive monthly allotments that may be "used only to purchase food from retail food stores which have been approved for participation" in the program. 7 U.S.C. § 2013(a). Households receive their monthly SNAP benefits via plastic EBT debit cards, which can be used only at authorized retail stores and only for eligible food items, such as any

1

"food or food product for home consumption except alcoholic beverages, tobacco, hot foods or hot food products ready for immediate consumption." 7 U.S.C. § 2012(k); *see also* 7 C.F.R. § 271.2 (definition of "eligible food"); *Saudabad Convenience, Inc. v. USDA*, No. 013-298-ML, 2014 WL 611194, at *1 (D.R.I. Feb. 18, 2014). Non-food items such as paper goods or cleaning supplies are also not eligible for purchase with SNAP benefits. *Saudabad Convenience, Inc.*, 2014 WL 611194, at *1. Authorized SNAP retailers swipe the household's EBT card using a point-of-sale device, like they would a credit or debit card. *ANS Food Mkt. v. United States*, Civil No. JKB-14-2071, 2015 WL 1880155, at *1 (D. Md. Apr. 22, 2015). The transaction debits the customer's SNAP account, and the retailer is reimbursed by the government. *Id.*

To participate in SNAP as a retailer, a store's owner must comply with applicable provisions and regulations. *Fells*, 627 F.3d at 1252 (citing 7 U.S.C. § 2018). FNS may disqualify participating stores for the improper use of benefits, including "trafficking," which is defined, in relevant part, as "[t]he buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits . . . for cash or consideration other than eligible food . . . ." 7 C.F.R. § 271.2; 7 U.S.C. § 2021(b)(3)(B).

To detect trafficking and other fraudulent activity involving SNAP benefits, FNS monitors stores with the Anti-Fraud Locator Using Electronic Benefit Transfer Retailer Transactions ("ALERT") computer program. *Tony's Pantry Mart Inc. v. United States*, No. 15 C 2967, 2017 WL 514184, at *2 (N.D. Ill. Feb. 8, 2017). "'When a store triggers an ALERT report through a pattern of suspicious transactions, the FNS may conduct an investigation, including a store visit, and the USDA may open a case and proceed with an administrative action against the store.'" *Id.* (quoting *Saudabad Convenience, Inc.*, 2014 WL 611194, at *1). In reaching a disqualification decision, FNS is authorized to rely on, among other things, on-site investigations, inconsistent redemption data, and evidence obtained through a transaction report under the EBT system. 7

U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a); *see also Tony's Pantry Mart*, 2017 WL 514184, at *2 (citing *Fells*, 627 F.3d at 1252-53).

**B.     Investigation of Ftex**

Ftex is a small grocery store owned by Ghizawi.  Defendant's 56.1 Statement of Material Facts ("DSMF") ¶¶ 2-3.  It is located at 5756 W. Chicago Avenue in Chicago, Illinois, and has been an authorized SNAP retailer under Ghizawi's ownership since 1999.  *Id*.  Ftex is open Monday through Saturday from 8:00 a.m. to 8:00 p.m., and Sunday from 8:00 a.m. to 6:00 p.m. *Id*. ¶ 4.[1]

The ALERT program detected unusual SNAP transaction activity at Ftex, which prompted an investigation.  *Id*. ¶ 5.  As part of its investigation, FNS analyzed Ftex's SNAP transactions for a four-month period from May 2016 through August 2016.  *Id*.  Based on its analysis of the store's SNAP transactions, FNS determined that Ftex's redemptions contained two patterns of transactions indicative of trafficking during this time period.  *Id*. ¶ 6.  First, there were 18 "sets" of rapid and repetitive transactions, known as "Scan B2" transactions.  *Id*. ¶ 8.  Scan B2 transactions are where multiple withdrawals are made from the account of a single SNAP household within unusually short time frames.  *Id*.  Specifically, in this case, in total there were 18 sets of transactions (37 individual transactions) and $2,097.29 in SNAP benefits that were made from single households within a 24-hour period.  *Id*. ¶¶ 8, 9.   The SNAP benefits redeemed in each transaction set ranged from $100.33 to $170.81, and the amount of time between the first and last transactions in each set ranged from 7 hours, 15 minutes to 23 hours, 37 minutes.  *Id*. ¶ 9.  FNS

---

[1]  The hours for Ftex have also been reported as 8:00AM – 11:30PM daily. The hours listed are from the deposition testimony of Imad Ghizawi (Q: What were your hours of operation in 1998? A: 8:00 to 8:00; Q: Okay. So from 1998, did the store hours ever change? A: No; Q: Okay. So earlier you told me that the hours were 8:00 a.m. to 8:00 p.m., seven days a week.  So what are the hours?  A:  Okay.  So every day 8:00 to 8:00 p.m. except for Sunday from 8:00 a.m. to 6:00 p.m.) Ex. 2, Ghizawi Dep. Tr. 27; 41; 92.

considers multiple transactions from the same EBT account in short periods of time a method that stores use to avoid single high-dollar transactions, and are therefore indicative of trafficking. *Id*. ¶ 10.

Second, FNS observed excessively large transactions from SNAP EBT accounts. *Id.* ¶ 11. These high-dollar transactions are known as "Scan F" transactions. *Id*. Ftex had 191 SNAP transactions that totaled $12,199.87 with transaction amounts that ranged from $51.85 to $146.97. *Id*. During the review period, Ftex's "Scan F" transactions were 300 percent higher than the average purchase amount for this store type. *Id.* ¶ 12. FNS considered these transactions "very unusual" and "highly unlikely" and indicative of trafficking given the inventory and characteristics of the store. *Id.* ¶ 12.

FNS compared Ftex with other SNAP authorized retailers in the area. *Id*. ¶¶ 14-17. FNS noted that within a one-mile radius of Ftex, there are 13 other small grocery stores, three medium grocery stores, one large grocery store, and one superstore where SNAP recipients can redeem SNAP benefits. *Id*. ¶ 14. FNS compared Ftex's total dollar volume of SNAP sales to the Cook County, Illinois, average for small grocery stores during the four-month period of May 2016 through August 2016 and found that Ftex's dollar volume was 68 percent higher than that average. *Id*. ¶ 15. FNS also compared Ftex's total dollar volume of SNAP sales to the total dollar volume of a similarly stocked small grocery store within a one-mile radius of Ftex during the same time period and found that Ftex's dollar volume was 46 percent higher than that competitor store. *Id*. ¶ 16. FNS also compared Ftex to that same competitor store and found that, during the four-month review period of May 2016 through August 2016, Ftex had substantially more "Scan B2" transactions and substantially more "Scan F" transactions and concluded that such disparity is an extremely strong indication that trafficking may be occurring. *Id.* ¶ 17.

Moreover, the agency also identified three separate SNAP households (household 2809,

4

household 4928, and household 2384) that had multiple "Scan F" or "Scan B2" transactions at Ftex. *Id*. ¶ 13. Each of the households traveled more than one mile to shop at larger stores or superstores yet spent considerably more at Ftex. *Id*. Household 2809 transacted $159.37 in SNAP benefits at Ftex, while transacting only $10.99 in SNAP benefits at a nearby supermarket it visited in July 2016. *Id*. Similarly, in July 2016, household 4928 transacted $293.92 in SNAP benefits at Ftex, while transacting only $176.59 at superstores and supermarkets visited. *Id*. In May 2016, household 2384 transacted $152.79 in SNAP benefits at Ftex, while transacting only $9.96 in SNAP benefits at a superstore. *Id*. FNS concluded that this type of SNAP redemption activity is indicative of trafficking. *Id*.

In addition to Ftex's EBT data, FNS reviewed information obtained during a contractor store visit that took place on November 16, 2016. *Id*. ¶ 18. The November 2016 store visit report documented that Ftex:

- did not use optical scanners at checkout.

- had no shopping baskets or shopping carts available for its customers.

- had one cash register or check-out station.

- had one SNAP EBT point-of-sale device.

- had no deli or prepared food section.

- did not sell meat/seafood specials or bundles or fruit/vegetable boxes.

*Id*. The contractor prepared a sketch of the store's layout and took digital photographs of the store during the store visit. *Id*. ¶ 19. The photos show a moderate amount of relatively inexpensive canned, packaged, and accessory food items; a very limited amount of pre-packaged meat products, including lunch meat, hot dogs, and bacon; limited fresh produce; limited dairy; and some beverage cases, including Gatorade and energy drinks in public view within the store. *Id*. ¶ 21. The photos also show that the available checkout area space is barricaded in plastic and affords

5

very little space for SNAP customers to place their purchased food items. *Id*. ¶ 22. The FNS contractor certified that the information contained in the store visit report was true and that the digital photographs accurately portray the situation at the store on the given date and time. *Id*. ¶ 20.

**C.  Ftex's Permanent Disqualification from SNAP**

Following the ALERT notification, the review of the November 2016 store visit report, and analysis of the EBT transaction data, FNS issued a charge letter to Ftex and Ghizawi on January 23, 2017. *Id*. ¶ 26. The charge letter identified two patterns of suspicious transactions indicative of trafficking in the store's SNAP sales and attached lists of the transactions upon which FNS relied in issuing its charge letter. *Id*. The letter advised Ftex that the sanction for trafficking is permanent disqualification from the program and gave the store ten days to respond to the charge letter. *Id*. ¶ 27. The charge letter informed Ftex and Ghizawi that they could request FNS to impose a civil monetary penalty ("CMP") of up to $59,000 in lieu of a permanent disqualification sanction. *Id*. ¶ 28. The charge letter further stated that, to be considered for a CMP, the store would have to provide, within 10 calendar days, documentation that it met the four criteria for a CMP in 7 C.F.R. § 278.6(i) and that no extension of time could be granted for making a request for a CMP or for providing such documentation. *Id*.

On February 2, 2017, Ftex and Ghizawi, through counsel, requested an extension of time to respond to the charge letter. *Id*. ¶ 29. The request for an extension acknowledged that Ftex and Ghizawi would forfeit their right to request a CMP in lieu of other sanctions. *Id*. On February 24, 2017, Ftex and Ghizawi submitted a Freedom of Information Act ("FOIA") request for certain records. *Id*. ¶ 30. The FOIA request and subsequent FOIA appeal operated to suspend further FNS action on the charge letter pending resolution of the FOIA appeal. *Id*. On September 14, 2020, following conclusion of the FOIA appeal, Ftex and Ghizawi submitted an additional reply

to the charge letter that stated trafficking did not occur at the store and provided arguments in support of their position as well as requested a CMP in lieu of permanent disqualification noting that the store had no prior adverse actions taken by FNS.  *Id*. ¶¶ 31, 32.

The reply attached a number of documents that Ftex claimed justified the transactions identified in the charge letter, including 26 undated photographs; a November 2016 report by FNS on foods typically purchased by SNAP households; a magazine article on convenience stores; a monthly SNAP benefit issuance schedule and a January 2017 FNS profile of SNAP households in the Illinois 7th Congressional District; a report by the Food Marketing Institute on U.S. grocery shopping trends in 2016; and three FNS "Reports of Negative Investigation" dated May 10, 2010, November 13, 2008, and November 24, 2015, respectively.  *Id*. ¶ 33.  Additionally, nine "Affidavit of EBT Customers" forms, each of which was signed under penalty of perjury by an individual identifying himself or herself as a customer who shopped "on a regular basis" at Ftex and who shopped "frequently" at Ftex "as [their] primary or one of [their] primary grocery markets." *Id*. ¶ 35.  Each affidavit declared, among other things:

- the name and address of the individual;

- a list of grocery items purchased by that individual for that individual's household;

- the dollar amount of "large purchases of groceries" that the individual sometimes makes from the store;

- the number of days within which the individual sometimes made "frequent purchases" from the store; and

- the percentage of that individual's SNAP benefits that the individual used at the store because it was one of or their primary grocery stores.  *Id*.

Ftex submitted an undated photograph of signage advertising three meat specials of $19.99, $29.99, and $39.99, respectively, but no photographs of actual product comprising those advertised

meat specials. *Id*. ¶ 38. Ftex did not submit itemized cash register or SNAP EBT receipts for any of the 228 transactions listed in the attachments to the charge letter. *Id*. ¶ 36. Nor did Ftex submit any invoices for purchases of grocery stock items, including fresh or frozen meat or other high-dollar items during the administrative stage. *Id*. ¶ 37.

FNS analyzed Ftex and Ghizawi's reply to the charge letter in a Retailer Reply and Case Sanction Recommendation ("CSR"). *Id*. ¶ 39. The CSR responded that Ftex is a small grocery store where households would normally purchase a limited number of items, and that there was little indication that SNAP households would be inclined to regularly visit the store to purchase large quantities of groceries. *Id*. ¶ 40. Further, the CSR compared Ftex to a similar small grocery store in the area, noting that the other store carried better stock than Ftex, had a fresh meat counter and offered meat bundles and had made-to-order deli sandwiches. *Id*. ¶ 43. Still, during the same four-month period of May 2016 through August 2016, Ftex had substantially more "Scan B2" transactions and substantially more "Scan F" transactions than that competitor store. *Id*. ¶ 44. The CSR noted the November 16, 2016, store visit report where meat bundle pricing and cheese and meat per pound pricing was posted in the store, but there were no visible products matching the offers. *Id*. ¶ 41. Further, Ftex and Ghizawi did not provide any information or evidence, such as vendor invoices or receipts, to show that the suspicious transactions were from the sale of meat bundles. *Id*. ¶ 42.

Focusing on the "Scan B2" transactions, the CSR concluded that Ftex and Ghizawi's generalized explanations for the supposed legitimacy of those transactions (including the customer forgetting an item in the prior transaction; co-shopping; the customer making a purchase, returning home, and then returning to the store to make another purchase; and normal shopping habits of SNAP participants) were unsupported. *Id*. ¶¶ 45-46. Likewise, the CSR rejected Ftex and Ghizawi's generalized explanations for the supposed legitimacy of "Scan F" transactions because

they were not plausible given the inventory and layout of the store. *Id.* ¶¶ 47-48. The CSR concluded that the Scan B2 and Scan F transactions were more likely the result of trafficking. *Id.* ¶¶ 46, 48.

In addressing the nine form "Affidavit of EBT Customers" submitted by Ftex and Ghizawi, FNS searched the Illinois SNAP database and identified eight of those individuals as SNAP recipients; of those eight individuals, only two individuals had SNAP EBT transactions that were listed in the attachments to the charge letter. *Id.* ¶ 50. One individual had three "Scan F" transactions that were listed in the charge letter, in the amounts of $59.17, $57.84, and $55.47, respectively. *Id.* ¶ 51. In that individual's "Affidavit of EBT Customers," that individual declared under penalty perjury that the individual shops frequently at Ftex and spends up to $105.00 in groceries at the store. *Id.* The other individual had one "Scan F" transaction that was listed in the charge letter, in the amount of $63.78. *Id.* In that individual's "Affidavit of EBT Customers," that individual declared under penalty of perjury that the individual shopped frequently at Ftex and spent up to $90.00 at the store. *Id.* The other six individuals that had no transactions listed in the charge letter declared under penalty of perjury that they shopped frequently at Ftex and spent up to $80.00, $70.00, $100.00, $85.00-$90.00, $80.00, and $110.00, respectively, at the store. *Id.* ¶ 52.

Based on the evidence, FNS concluded that trafficking was more likely than not occurring at the store. *Id.* ¶ 53. On November 6, 2020, FNS issued a letter to Ftex and Ghizawi permanently disqualifying the firm from SNAP ("determination letter"). *Id.* ¶ 54. The determination letter notified Ftex and Ghizawi that the disqualification was effective upon receipt of the letter and that they had ten calendar days to submit a written request for administrative review of the determination, and also that the store was not eligible for a CMP because they failed to submit sufficient evidence that it had established and implemented an effective compliance policy and

program to prevent SNAP violations. *Id.* ¶¶ 55-56.

Ftex and Ghizawi requested administrative review of the determination letter by FNS's Administrative Review Branch on November 13, 2020. *Id.* ¶ 57. Ftex and Ghizawi submitted a legal brief and other documents already submitted with its former reply that they claimed justified the transactions identified the charge letter. *Id.* ¶ 58. However, Ftex still did not submit itemized cash register or SNAP EBT receipts for any of the 228 transactions listed in the attachments to the charge letter, nor did it include any invoices for purchases of grocery stock items, including fresh or frozen meat or other high-dollar items. *Id.* ¶¶ 59-60.

On February 8, 2021, an FNS administrative review officer issued the Final Agency Decision upholding FNS's determination of trafficking and the penalty of permanent disqualification. *Id.* ¶ 61. The decision referenced, among other things, the minimal quantity and variety of staple foods, the lack of unique items such as ethnic or specialty food items, the lack of food packages, bundles, or bulk items other than a limited number of cases of drinks, the lack of shopping carts or baskets, the lack of deli meats and meat or seafood bundles, and the extremely small checkout area. *Id.* ¶ 62. The decision noted that the November 16, 2016, store visit report documented the presence of signage that advertised three meat packages, but that there was no evidence that the store actually sold fresh or frozen meat. *Id.* ¶ 63. The decision also referenced an earlier store visit report from February 13, 2016. *Id.* ¶¶ 25, 63. With respect to such meat specials, the only material difference between the two store visits was that the February 2016 report noted the presence of meat packages and specials and included photographs showing what appeared to be some fresh or frozen unprocessed meats, but the November 2016 report did not. *Id.* ¶ 25. In fact, the November 2016 report and accompanying photos depicted a hanging cupboard mounted over the signage advertising meat packages obscuring the price and contents. *Id.* ¶¶ 24, 63.

The decision analyzed the 18 sets of "Scan B2" transactions and found that they displayed unusual or suspicious characteristics that were inconsistent with the store's inventory and facilities and thus were indicative of trafficking. *Id*. ¶ 65. The decision noted that such multiple transactions over a short period of time, especially those of high dollar value, are indicative of attempts to obscure trafficking to avoid a high dollar transaction that cannot be supported by dividing it into a series of smaller dollar value transactions. *Id*. ¶ 66. The decision also analyzed the 191 "Scan F" transactions and noted that these transactions displayed unusual or suspicious characteristics that were inconsistent with the store's inventory and facilities and thus were indicative of trafficking. *Id*. ¶ 67. The decision noted that such high-dollar transactions are uncharacteristic for a small grocery store offering a minimal stock of staple foods, considering the proximity of other stores in the area offering a greater quantity and variety of SNAP eligible food items, and are indicative of trafficking and further noted that transactions over a short period of time of large value, or large cumulative value, in which SNAP benefits are exhausted are an indicator of trafficking. *Id*. ¶ 68.

Further, in reviewing the nine affidavits submitted by Ftex and Ghizawi, it was noted that only eight were found to be SNAP users. *Id*. ¶ 69. Of those eight, during the review period, three households conducted no transactions at Ftex, and three households conducted four, five, and nine transactions, respectively, with none of those transactions appearing in the charge letter. Of the remaining two households, one household conducted six transactions at Ftex, with only three "Scan F" transactions appearing in the charge letter, and one household conducted 13 transactions at Ftex, with only one "Scan F" transaction appearing in the charge letter. *Id*. Notwithstanding the numerical data to the contrary, these households executed affidavits under the penalty of perjury that they shop frequently at Ftex as their primary, or one of their primary, grocery stores and that they redeem large amounts of SNAP benefits at the store. *Id*. ¶ 35. Most notably, it was found that SNAP redemptions at Ftex fluctuated in a manner that FNS deemed as unusual

following the store visit on February 16, 2016, and following receipt of the charge letter dated January 24, 2017, supporting a clear indication of trafficking. *Id*. ¶ 70. Based on a review of evidence, the administrative officer sustained the agency's trafficking determination and penalty of permanent disqualification, finding that it was more likely true than not true that the program violations did occur as charged. *Id*. ¶ 71. The decision also sustained the determination to not impose a CMP in lieu of the penalty of permanent disqualification, noting that Ftex acknowledged that it forfeited its right to request a CMP, and that Ftex did not timely request or provide substantial evidence that it met the regulatory criteria for a CMP. *Id*. ¶ 72.

Ftex and Ghizawi filed suit in district court appealing FNS' final administrative decision. *Id*. ¶ 73.

## Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only when a reasonable trier of fact could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering the motion, all reasonable inferences must be drawn in favor of the non-moving party. *Bailor v. Salvation Army,* 51 F.3d 678, 681 (7th Cir. 1995). However, the movant on summary judgment can prevail "by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1183 (7th Cir. 1993). The non-movant cannot rely on mere conclusions and allegations to create issues of fact. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008). Rather, after a properly supported motion for summary

judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 255-56.

Pursuant to 7 U.S.C. § 2023, the court conducts a de novo review to "determine the validity of the questioned administrative action." 7 U.S.C. § 2023(a)(15); *Ibrahim v. United States,* 834 F.2d 52, 53-54 (2d Cir. 1987) (noting that this review "'requires a reexamination of the entire matter rather than a mere determination of whether the administrative findings are supported by substantial evidence.'") (quoting *Saunders v. United States*, 507 F.2d 33, 36 (6th Cir. 1974)); *see also Tony's Pantry Mart Inc. v. United States*, 2017 WL 514184, at *4 ("The Court's judicial review of the administrative finding of a trafficking violation is de novo giving the plaintiff 'an opportunity to show that the factual determination was wrong.'" (quoting *McGlory v. United States*, 763 F.2d 309, 311 (7th Cir. 1985) (per curiam)). But a party is not entitled to a de novo *trial* if summary judgment is appropriate. *E.g.*, *Tony's Pantry Mart*, 2017 WL 514184, at *7; *Petra Mini Mart, Inc. v. United States*, No. 16-CV-4573, 2017 WL 2445134, at *3, *5 (N.D. Ill. June 6, 2017).

Importantly, the aggrieved retailer—in this case, Ftex and Ghizawi—bears the burden at trial of proving by a preponderance of the evidence that the agency's decision was invalid. *Tony's Pantry Mart*, 2017 WL 514184, at *4 (citing *Fells*, 627 F.3d at 1253); *see also Bros. Food & Liquor, Inc. v. United States*, 626 F. Supp. 2d 875, 879 (N.D. Ill. 2009) ("Plaintiff has the burden of proving by a preponderance of the evidence on this fresh record that the administrative decision was invalid because violations did not occur."). As such, store owners must essentially prove their innocence. *Onukwugha v. United States*, No. 11-CV-907, 2013 WL 1620247, at *5-6 (E.D. Wis. Apr. 12, 2013). "Because 'permanent disqualification is warranted on "the first occasion" of coupon trafficking, [thus] it is Plaintiff's burden to raise material issues of fact as to *each* of the transactions set forth as suspicious by the FNS.'" *Tony's Pantry Mart*, 2017 WL

13

514184, at *5 (emphasis added) (alterations in original) (quoting *Kahin v. United States*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000). Where the store fails to meet this burden and affirmatively present a material dispute of fact as to the existence of a violation, the entry of summary judgment is proper. *See J. Mart, Inc. v. United States*, C.A. No. 13-424 S, 2013 WL 5755186, at *3 (D.R.I. Oct. 23, 2013); *Kahin*, 101 F.Supp. 2d 1299 at 1302. *See also Tony's Pantry Mart*, 2017 WL 514184, at *5 (finding Plaintiff's explanations regarding the store's suspicious SNAP activity to be "insufficiently specific to raise a genuine factual dispute for trial").

## Argument

### A.  FNS's Trafficking Determination Is Fully Supported by the Administrative Record.

FNS permanently disqualified Ftex and Ghizawi from participating in SNAP based on the evidence in the administrative record, including irregular EBT data, observations made during two store visits, and a review of customer SNAP transactions at other stores in the area. DSMF ¶ 71. Ftex and Ghizawi argue through their administrative response, complaint, and discovery responses that this evidence does not establish that trafficking occurred, suggesting instead that FNS's data is unreliable, and offering unsupported and generalized explanations for the unusual patterns of transactions. *Id.* ¶¶ 33-35. However, these explanations are insufficient to satisfy their burden of establishing by a preponderance of the evidence that trafficking did not occur. Accordingly, summary judgment is warranted.

Ftex and Ghizawi are asking the court to reverse the Final Agency Decision upholding permanent disqualification. They start by attacking the validity of the ALERT system to detect trafficking, *id.* ¶ 34, arguing that there has been no study by the USDA to indicate that the irregular transactions detected are meaningfully correlated to trafficking. *Id.* Ftex and Ghizawi argue that the ALERT system is unreliable where the business model, population dynamics, pricing and inventory are not considered *Id.* However, the statute and regulations expressly permit

disqualifications from SNAP based on "inconsistent redemption data" or "evidence obtained through a transaction report under an electronic benefit transfer system." 7 U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a). Federal courts "have repeatedly upheld the FNS's permanent disqualification determinations based on similar EBT transaction reports at summary judgment." *Tony's Pantry Mart*, 2017 WL 514184, at *4 (citing *Young Choi Inc. v. United States*, 639 F. Supp. 2d 1169, 1179 (D. Haw. 2009)) ("The law is clear that FNS may base its finding of a violation on analysis of EBT transaction reports or on-site store surveys."). *See also Shanaa v. United States*, No. 15-CV-42, 2017 WL 2838150, at *3 (E.D. Wis. June 30, 2017) ("Federal courts routinely uphold FNS's permanent disqualifications based on suspicious EBT transaction data."). *See also*, *First on First Deli v. United States*, 21-CV-6965, 2022 WL 522427, at *3 (S.D.N.Y. Feb. 2, 2022) ("After suspicious transactions were discovered by the ALERT system, Plaintiffs' data was then analyzed, compared with nearby stores, and an in-store investigation was performed to further determine whether Plaintiffs engaged in SNAP trafficking. Thus, the reliability of the ALERT system is not relevant to FNS' determination to disqualify Plaintiffs.") (citing *Loma Deli Grocery Corp. v. United States*, 20 Civ. 7236, 2021 WL 4135216, at *8 (S.D.N.Y. Sept. 10, 2021)). The "'crux of this case is not whether the ALERT system is a reliable investigative tool'; it is 'whether Plaintiffs can demonstrate by a preponderance of the evidence that they did not engage in trafficking of SNAP benefits as charged and determined by the Agency.'" *Loma Deli Grocery*, 2021 WL 4135216, at *11 (quoting *Timsina v. United States*, 2:17 Civ. 126, 2019 WL 3254689, at *3 (D. Vt. July 19, 2019), *aff'd*, 835 F. App'x 633 (2d Cir. 2020)).

In reviewing Ftex's EBT data from May 2016 to August 2016, FNS found two patterns of SNAP transactions that are indicative of trafficking: (1) 18 sets (or 37 individual transactions) where multiple withdrawals were made from of a single SNAP account within unusually short time frames; and (2) 191 excessively large purchase transactions. DSMF ¶¶ 6, 8, 11. Both patterns

15

identified by FNS are each alone enough to permit disqualification from SNAP. *Negash v. United States*, No. 17-1954, 2018 WL 722481, at *3-4 (D. Md. Feb. 5, 2018) (granting summary judgment for the United States based on EBT data that included depletion of the majority or all of a household's benefits in a short timeframe, "high-dollar" transactions, and rapid and repetitive transactions in a short timeframe); *Rockland Convenience Store v. United States*, Civil No. 10-cv-260-LM, 2011 WL 5120410, at *5-12 (D. N.H. Oct. 27, 2011) (granting summary judgment for the United States based on "same cents value" EBT transactions, but also addressing other EBT anomalies such as "rapid successive transactions" and "high-dollar" transactions).

Furthermore, FNS did not rely solely on EBT data. Rather, as the regulations permit, FNS also considered information gathered from two on-site visits to Ftex that provided more evidence that the store engaged in trafficking. DSMF ¶¶ 18-25. The visits revealed, among other things, that the store did not have the type of inventory that would lend itself to large transactions. *Id.* ¶¶ 48, 67-68. For example, according to the November 2016 store visit report, the store had limited staple foods, no fresh meat, limited fresh produce, no baskets or shopping carts, and minimal counter space. *Id.* ¶ 46. Ftex and Ghizawi attack the thoroughness of the on-site visits, stating that each time the store was sufficiently stocked to satisfy the purchase amounts FNS identified as suspicious *Id.* ¶ 34. Ghizawi testified that his store offered meat specials costing between $19.99 and $39.99. *Id.* ¶ 74. However, the meat special signage that was present in the store visit report from November 2016 shows meat specials costing between $9.95 and $19.95, and the price and contents of the third meat special were obscured and permanently covered by a mounted cabinet. *Id.* More convincingly, while the February 2016 store visit report's photographs do not show the mounted cabinet obscuring the meat special signage and do show what appears to be some fresh or frozen unprocessed meats, there was no evidence nine months later in the November 2016 store visit report of fresh or frozen meat or stock available to fill meat bundle orders. *Id.* ¶¶ 25, 63. Ftex

16

and Ghizawi provided undated photos depicting different signage of meat specials costing between $19.99 and $39.99, but these photos were not submitted to FNS until September 4, 2020, nearly four years after the charge letter was issued. *Id.* ¶ 38. Even the undated photographs submitted by Ftex in support of its request for administrative review did not depict any actual fresh or ground meat comprising any meat specials. *Id*. ¶ 64. Ghizawi also testified that in 2016 Ftex sold Red Bull cases for $25.99. *Id*. ¶ 75. However, the November 2016 store visit report does not show any Red Bull cases for sale. *Id*. Ftex and Ghizawi provided undated photos depicting Red Bull with a price of $35.99 for one case and $59.99 for two cases, but these photos were not submitted to FNS until September 14, 2020, nearly four years after the charge letter was issued. *Id*. ¶ 75. Considering Ftex and Ghizawi's response, the food stock available compounded with the limited counterspace and lack of baskets and carts for customers make it more plausible that the high-dollar suspicious transactions were the result of trafficking. In short, Ghizawi's contentions are either contradicted by or unsupported in the written record, but even if high-dollar items such as meat bundles and Red Bull cases were being sold at Ftex throughout the four-month review period of May 2016 through August 2016, they are unable to meet their high burden of raising a material issue of fact as to *each* of the transactions set forth as suspicious by FNS based on all of the other evidence indicative of trafficking.

Similarly, Ftex and Ghizawi's explanation for the 18 sets of rapid and repetitive transactions is not supported by evidence in the record. Ftex and Ghizawi contend that customer shopping habits and proximity to the store are the reasons that the transactions are justified. *Id*. ¶ 45. They argued that customers forgetting an item in the prior transaction; co-shopping; the customer making a purchase, returning home, and then returning to the store to make another purchase; and normal shopping habits of SNAP participants are typical. *Id*. However, these explanations do not explain why 18 households made 37 transactions between $37.77 and $91.86

17

(with 24 transactions in excess of $50.00) within a 24-hour time span. As the administrative officer noted, it is not a usual shopping pattern to see so many purchases, in a short period of time, by the same households. *Id*. ¶ 65. Households making multiple transactions within a short period of time is a known method that stores use to avoid single high dollar transactions that cannot be supported by a store's inventory or structure, as is the case with Ftex. *Id*. ¶ 66. Ftex and Ghizawi's generalized explanations do not negate that these transactions are evidence of tracking. The court may grant summary judgment on this basis alone. *Kahin*, 101 F. Supp. 2d at 1303 (noting that while plaintiff's "explanations about the spending patterns" of certain customers "may tend to negate some of the inferences from the EBT data and raise some material issues of fact," the explanations "do not sufficiently account for all the suspicious activity"); *see Tony's Pantry Mart*, 2017 WL 514184, at *5 (citing *McClain's Mkt. v. United States*, 411 F. Supp. 2d 772, 777 (N.D. Ohio 2005)) ("store owner's 'affidavit presents no explanation of any of the 149 transactions asserted against plaintiff, but merely presents general justifications for large expenditures[, and a]ny one of the 149 transactions is sufficient to establish a violation.'").

Likewise, Ftex and Ghizawi's explanation for the high-dollar transactions identified by FNS is also not enough to preclude summary judgment. FNS identified 191 transactions of $51.85 or more during the review period. FNS is a small grocery store where households would normally purchase a limited number of items, and there is little indication that SNAP households would be inclined to regularly visit the store to purchase large quantities of groceries. DSMF ¶ 40. Moreover, there was little evidence that higher priced bulk items or meat bundles were even available for purchase. *Id*. ¶¶ 41-42, 63. Therefore, it would take a substantial volume of eligible food items available at Ftex to reach these transaction amounts. Indeed, Ftex did not submit any invoices for purchases of high-dollar items. *Id*. ¶¶ 37, 60. During the course of this litigation, Ftex produced some credit card statements showing items purchased from Sam's Club and some

invoices from Home Juice Corporation, but neither of these confirmed purchases of fresh meat for meat bundles or high value items. *Id.* ¶ 73. With no baskets or carts, and limited counter space for customers, it is unlikely that SNAP households would make such large transactions at once. *Id.* ¶ 46. Consequently, high-dollar transactions are uncharacteristic for a small grocery store like Ftex offering a minimal stock of staple foods and are more likely indicative of trafficking. *Id.* ¶ 68.

Here, Ftex's argument relies heavily on its affidavits. While the deficiencies in Ftex's nine affidavits have already been covered, it is worth noting here that only eight are actually SNAP households, and of those eight households only five made transactions during the review period, and only two had transactions appearing in the charge letter. *Id.* ¶¶ 51-52, 69. In short, the nine affidavits accounted for just 4 of the 228 suspicious transactions identified. *Id.* None of the affidavits explain or justify the transactions; rather the affiants identify themselves as frequent customers who spend up to certain amounts regularly and use Ftex as a primary grocer. *Id.* However, these affidavits are not evidence that support Ftex's generalized argument that many of its customers are using it as a primary grocer. Indeed, a closer look at three households who shopped at Ftex during the review period showed that they had access to and also patronized larger grocery stores, supermarkets, and superstores that would have more stock and staple foods. *Id.* ¶ 49. Again, Ftex and Ghizawi provided no register receipts or itemized sales information that would justify such high transactions. *Id.* ¶¶ 36, 59. They also cannot reasonably respond to why households would spend so much of their SNAP benefits at Ftex when they had access to and frequented larger stores. *Id.* ¶ 49. Ftex and Ghizawi's failure to provide this type of requisite information prevents them from satisfying their burden of showing by a preponderance of the evidence that the agency's trafficking determination was invalid.

Finally, evidence that trafficking occurred is shown in the fluctuation of SNAP

redemptions at Ftex following the store visit on February 13, 2016, and again after the charge letter was issued on January 24, 2017. *Id.* ¶ 70. The data shows that following the February 13, 2016, store visit, the volume of SNAP redemptions at Ftex decreased 54 percent and the average dollar amount of SNAP transactions decreased 55 percent from January 2016 to March 2016. *Id.* During the same time frame, the number of SNAP transactions increased 2.99 percent. *Id.* Once FNS sent Ftex an initial charge letter in January 2017, the volume of SNAP redemptions at Ftex decreased 41 percent and the average dollar amount of SNAP transactions decreased 42 percent from December 2016 to February 2017, while the number of SNAP transactions increased 1 percent *Id.* The volume of SNAP redemptions at Ftex dropped from nearly $30,000 each month before the first store visit to only $8,757.76 after the charge letter was received, representing nearly a 70 percent decline in monthly sales. *Id.* Such a decline in activity is abnormal in the *regular* course of business, and a clear indication that trafficking was occurring. Accordingly, from these fluctuations, the "only logical conclusion possible based on the evidence" is that Ftex was trafficking benefits. *Negash*, 2018 WL 722481, at *4. Therefore, the United States is entitled to summary judgment.

## B. The Sanction Imposed Was Supported by the Law and Facts.

FNS's decision to permanently disqualify Ftex and Ghizawi is proper in this case. When a court upholds FNS's determination that there was a trafficking violation, it next must determine whether the sanction was "unwarranted in law or without justification in fact." *183 Bronx Deli Grocery Corp. v. United States*, No. 11 Civ. 1527, 2012 WL 2359664, at *4 (S.D.N.Y. June 18, 2012) (citations omitted). In other words, the "penalty imposed by the FNS for violations of the Food Stamp Program may be set aside *only* if it is arbitrary or capricious." *Estremera v. United States*, 442 F.3d 580, 585 (7th Cir. 2006) (quoting *Brooks v. United States*, 64 F.3d 251, 256 (7th Cir. 1995)) (emphasis added). "If the penalty imposed is in accordance with the settled policy of

20

the FNS, it is not arbitrary or capricious." *109 Merrick Deli Corp. v. United States*, No. 11-CV-977 (SLT)(RER), 2014 WL 6891944, at \*5 (quoting *Yafaie v. United States*, No. 94 Civ. 7825(KMW), 1995 WL 422169, at \*1 (S.D.N.Y. July 18, 1995)). "'A sanction is not arbitrary and capricious when a federal agency properly adheres to its own regulations and guidelines when imposing it.'" *Tony's Pantry Mart*, 2017 WL 514184, at \*7 (quoting *Young Jin Choi v. United States*, 944 F. Supp. 323, 325 (S.D.N.Y. 1996).

Under the FNA and its implementing regulations, permanent disqualification is mandatory upon a determination of trafficking by FNS. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). In other words, trafficking is a strict liability offense. *See Idias v. United States*, 359 F.3d 695, 697 (4th Cir. 2004) ("[A] store that is caught trafficking in food stamps even one time must be permanently disqualified from the Food Stamp Program, unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking policy.").

Here, FNS offered consideration of a civil money penalty ("CMP") of up to $59,000 in lieu of a permanent disqualification sanction in the charge letter. DSMF. ¶ 28. The charge letter stated that the store had to provide, within ten calendar days, documentation that it met the four criteria for a CMP in 7 C.F.R. § 278.6(i) and that no extension of time could be granted for making a request for a CMP or for providing such documentation. *Id.* Ftex and Ghizawi responded to the charge letter requesting an extension and acknowledged that they would forfeit their right to request a CMP in lieu of other sanctions. *Id.* ¶ 29. As the administrative review officer noted in the FAD, the store neither timely requested a CMP nor provided substantial evidence that it met the criteria in 7 C.F.R. § 278.6(i). *Id.* ¶ 72. Moreover, even if Ftex had timely requested a CMP and had not affirmatively waived its right to do so under the regulations, merely pointing to prior agency findings of no program violations, *see id.* ¶¶ 32, 58, is not sufficient to establish by substantial evidence the regulatory criteria set forth in 7 C.F.R. § 278.6(i). Given permanent

disqualification was imposed in accordance with the regulations and settled policy of FNS, it is not arbitrary or capricious, and should be upheld. *109 Merrick Deli*, 2014 WL 6891944, at *5.

**Conclusion**

For the foregoing reasons, summary judgment should be granted in favor of the United States.

Respectfully submitted,

MORRIS PASQUAL.
United States Attorney

By: s/ Paraisia Winston Gray
    PARAISIA WINSTON GRAY
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 469-6008
    paraisia.winston.gray@usdoj.gov